# In the United States Court of Federal Claims

No. 21-953

(Filed: October 26, 2023)

```
*****************************************
MANITOU ISLAND TRANSIT, LLC,       *
                                   *
              Plaintiff,           *
                                   *
       v.                          *
                                   *
THE UNITED STATES,                 *
                                   *
              Defendant.           *
*****************************************
```

*Douglas E. Fierberg*, The Fierberg National Law Group, PLLC, Traverse City, MI, counsel for Plaintiff.

*Ebonie I. Branch*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom was *Colleen M. Burnidge*, Attorney-Advisor, Office of the Solicitor, Department of the Interior.

## OPINION AND ORDER

**DIETZ, Judge.**

Manitou Island Transit, LLC ("MIT") brings this suit alleging detrimental reliance and breach of contract in connection with a concession contract with the National Park Service ("NPS") under which MIT provides commercial ferry services to the North and South Manitou Islands ("the Islands") in the Sleeping Bear Dunes National Lakeshore ("the Park"). MIT claims that the NPS breached its contractual obligation by failing to ensure that the docks on both of the Islands were accessible during the 2020 season. The government moves to dismiss MIT's detrimental reliance claim for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). The government also moves to dismiss MIT's breach of contract claim for failure to state a claim under RCFC 12(b)(6) or, alternatively, for summary judgment pursuant to RCFC 56.[1] MIT opposes the government's motions to

---

[1] The Court treats the government's motion to dismiss MIT's breach of contract claim as a motion for summary for judgment. RCFC 12(d) states that "[i]f, on a motion under RCFC 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment[.]" In its motion, the government attaches an appendix of exhibits, *see* Def.'s App. to Def.'s Corrected Mot. to Dismiss [ECF 28-1], and references documents outside the pleadings when discussing MIT's breach of contract claim, *see* Def.'s Corrected Mot. to Dismiss [ECF 28] at 19-24. Accordingly, the Court treats the motion as a motion for summary

dismiss and requests that the Court grant summary judgment in its favor on its breach of contract claim.

For the reasons explained below, the Court finds that MIT's detrimental reliance claim is outside of this Court's jurisdiction because it is a claim for promissory estoppel. The Court also finds that there is no genuine dispute of material fact with respect to MIT's breach of contract claim, that the concession contract imposes an obligation on the NPS to ensure that MIT has access to the docks during the portion of the year that MIT is obligated to provide ferry services, and that the NPS breached its obligation under the contract. Therefore, the Court **GRANTS** the government's motion to dismiss MIT's detrimental reliance claim, **DENIES** the government's motion for summary judgment on MIT's breach of contract claim, and **GRANTS** MIT's cross-motion for summary judgment on its breach of contract claim.

I.    BACKGROUND

Since 1917, MIT has operated a ferry service to North Manitou Island and South Manitou Island in Lake Michigan. Compl. [ECF 1] ¶ 1. MIT launches its ferries out of Leland, Michigan, which is approximately 12 miles from North Manitou Island and 16 miles from South Manitou Island. Pl.'s Reply in Support of Cross-Mot. for Summ. J. [ECF 36] at 5-6.[2] MIT's ferry service route to the Islands is detailed on the map below:



---

judgment. *See Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 166 (2014) (citing *Rotec. Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1250 (Fed. Cir. 2000).

[2] All page numbers in the parties' briefs refer to the page numbers generated in the CM/ECF system.

[ECF 28-1] at 76. In the 1970s, when it created the Park, the NPS exercised eminent domain over private property and the docks on the Islands. [ECF 1] ¶ 1.[3] Over the past several decades, "MIT has entered into an uninterrupted sequence of Concessions Contracts with NPS to run seasonal day-trips and overnight camping trips taking the public to the Islands." *Id.*

In March of 2019, MIT entered a ten-year Category III[4] Concession Contract (the "Contract") with the NPS that runs through March 15, 2029. [ECF 28-1] at 5-56. Under the Contract, MIT is required to run its ferry service to the Islands from May 1 to early November. *Id.* at 7, 25. The minimum frequency requirements for the ferry service are as follows:

**Minimum Frequency of Scheduled Ferry Service**

| Dates | South Manitou | North Manitou |
|---|---|---|
| 5/1 through 5/30 | Fri., Sat., Sun., Memorial Day | Fri., Sat., Sun., Memorial Day |
| 6/1 through 6/15 | Fri., Sat., Sun., Mon., Wed. | Fri., Sun., Wed. |
| 6/16 through 6/30 | Daily | Fri., Sun., Wed |
| 7/1 through 9/3 | Daily | Daily |
| 9/4 through 9/14 | Fri., Sat., Sun., Wed., | Fri., Sun., Wed. |
| 9/15 through 10/8 | Fri., Sat., Sun., Columbus Day | Fri., Sun., Columbus Day |
| Last Saturday in October to first Saturday in November | Saturday | Saturday (deer hunt) |

*Id.* at 25. MIT is obligated to pay the NPS a franchise fee of "[f]our percent (4%) of [MIT's] gross receipts for the preceding year or portion of a year or a flat fee of $1000, whichever is greater." *Id.* at 9. MIT is also prohibited from "construct[ing] any Capital Improvements upon Area lands." *Id.* at 8. The Contract further provides that the NPS will establish an Operating Plan. [ECF 28-1] at 7. The Operating Plan, attached as Exhibit B to the Contract, states that

---

[3] MIT requests that the Court take judicial notice of the fact that "[i]n the 1970's and 1980's, the [NPS], an agency of the United States Department of the Interior, made North and South Manitou Islands part of the [the Park] by exercising eminent domain over private property and the docks located on and servicing [the Islands]." Pl.'s Req. for Judicial Notice [ECF 30] at 1. In its request, MIT cites to a publication from the NPS. *See id.* The government did not file a response to MIT's request that the Court take judicial notice.

The decision to take judicial notice is within the discretion of the Court. *See K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1367 (Fed. Cir. 2014); *Confidential Informant 59-05071 v. United States*, 134 Fed. Cl. 698, 711 (2017). Under Federal Rule of Evidence 201, the Court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." The Court finds that it is appropriate to take judicial notice in this case because the fact is readily determinable from a source published by the government. *See Arrowood Indem. Co. v. United States*, 148 Fed. Cl. 299, 312 n.9 (2020).

[4] The NPS uses a Category III concession contract "when neither land nor buildings are involved in the operation." National Park Service, *Concession, Commercial Services Program Glossary*, https://www.nps.gov/subjects/concessions/glossary.htm. This type of concession contract is distinguishable from Category I concession contracts, which "exist when a concessioner constructs capital improvements on park lands" and Category II concession contracts, which "exist when a concessioner operates on assigned land or in a government building, but makes no construction or capital improvements to the property." *Id.*

"[t]he [NPS] is committed to the upkeep and maintenance of the docks on North and South Manitou Islands to ensure access by [MIT's] vessels."[5] *Id.* at 37.

For MIT to operate its ferry service, the sand around the North Manitou dock must be dredged "every four to five years." App. to Pl.'s Cross-Mot. for Summ. J. [ECF 29-1] at 50. The North Manitou dock requires regular dredging because the sands in Lake Michigan shift over time, especially during the winter months, reducing the water's depth and potentially making the docks inaccessible for large vessels. [ECF 28-1] at 207; [ECF 29-1] at 46, 49. As of 2017, the North Manitou dock had not been dredged since 2011. [ECF 28-1] at 148; [ECF 29-1] at 50. The NPS intended to dredge the North Manitou dock beginning in 2017. [ECF 29-1] at 49-50, 126. The NPS secured sufficient funding for the dredging project by August 17, 2018, and the funding was supplemented on July 29, 2020. [ECF 28-1] at 117, 143-44. On September 13, 2019, the NPS contracted the United States Army Corps of Engineers ("USACE") to dredge the North Manitou dock. [ECF 28-1] at 81-83. Anticipating sand movement during the winter, the NPS and the USACE planned to dredge the North Manitou dock during the spring of 2020. *Id.* at 148.

In the summer of 2019, Lake Michigan saw record-high water, which raised concerns about the South Manitou dock where water levels were reaching "just below the decking." [ECF 29-1] at 42. Anticipating "high water" in 2020, the NPS purchased lumber and supplies in the fall of 2019 to "raise the dock on South Manitou Island before the 2020 season." *Id.*

From the beginning of the 2020 season, MIT was unable to access the North Manitou dock with its ferries because "the sand had moved dramatically over [the winter of 2019-2020] and blocked off access to the north dock." [ECF 28-1] at 207. Additionally, in "late April, early May" of 2020, the NPS discovered that the record-high water levels in Lake Michigan had "completely disconnected [the South Manitou dock] from its pilings." *Id.*

The outbreak of COVID-19 in the spring of 2020 impacted the NPS's ability to address the conditions at the docks. The USACE could not begin dredging in the spring due to scheduling complications caused by the pandemic. [ECF 28-1] at 207-08. Additionally, the NPS paused all hiring and onboarding until June 2020, [ECF 29-1] at 42; and the Park was closed to all activity from April 2020 to May 2020, reopening just prior to Memorial Day under certain restrictions, [ECF 28-1] at 208. The restrictions on the NPS facilities, including campgrounds, trails, trailheads, restrooms, and the visitor center, remained in place until July 1, 2020. [ECF 28-1] at 194-98. Following the COVID shutdown, the Park saw record attendance during the 2020 season. *Id*. at 208.

MIT was prepared to operate for the 2020 season in compliance with COVID restrictions and guidelines. [ECF 29-1] at 58. However, on June 8, 2020, MIT announced that it would be canceling ferry service for the summer due to the inaccessible dock conditions. [ECF 28-1] at 87.

---

[5] The Court replaces "Area" in the original language of the Contract with "[NPS]." The Contract defines "Area" as "the property within the boundaries of Sleeping Bear Dunes National Lakeshore." [ECF 28-1] at 12. The Court has construed "Area" to mean the Sleeping Bear Dunes National Lakeshore administration because property lacks the requisite sentience to do anything. The government does not dispute that "Area" as used in this clause refers to the NPS. *See* [ECF 28] at 10 ("Section 6(B)(3)(e) of the Operating Plan states that [the] *NPS* is '[c]ommitted to the upkeep and maintenance of the docks on North and South Manitou Islands to ensure access by the Concessioner's vessels.'") (emphasis added).

4

The following day, MIT asked to be released from the Contract for the 2020 season because it had "no access to the docks." *Id.* at 89. On June 26, 2020, the NPS agreed to temporarily suspend the Contract, stating in a letter to MIT that "[t]he inaccessibility of the docks at both islands has rendered the landing conditions unsafe." *Id.* at 91.

The USACE did not begin dredging the North Manitou dock until August 6, 2020. [ECF 28-1] at 151. It completed the work on August 21, 2020. *Id.* On August 26, 2020, the NPS informed MIT that it could resume ferry services to the North Manitou dock. [ECF 29-1] at 128. However, at that point in the season, MIT concluded that it was not economically feasible to incur the costs of restarting operations and chose not to operate for the remainder of the 2020 season. *Id.* at 114-17. On September 1, 2020, the NPS issued a solicitation to raise the South Manitou dock. [ECF 28-1] at 154. On January 26, 2021, MIT was informed that the South Manitou dock would be accessible for the 2021 operating season. *Id.* at 192.

MIT filed its complaint in this Court on February 19, 2021, alleging detrimental reliance and breach of contract and seeking $500,000 in compensatory damages for the NPS's failure to maintain the docks to ensure access by its ferries during the 2020 season. [ECF 1]. On January 14, 2023, the government filed a 12(b)(1) motion to dismiss MIT's detrimental reliance claim and a 12(b)(6) motion to dismiss, or alternatively, a motion for summary judgment on MIT's breach of contract claim. [ECF 28].[6] On February 10, 2023, MIT filed a response to the government's motions and a cross-motion for summary judgment on its breach of contract claim. [ECF 29]. The parties' motions are fully briefed, and the Court conducted oral argument on August 14, 2023. Scheduling Order [ECF 38].

## II.     LEGAL STANDARDS

Jurisdiction is a threshold issue that the court must address before proceeding to the merits of the case. *See Remote Diagnostic Techs. LLC v. United States*, 133 Fed. Cl. 198, 202 (2017) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). A motion to dismiss a claim for lack of subject-matter jurisdiction under RCFC 12(b)(1) challenges the court's "general power to adjudicate in specific areas of substantive law." *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999). When considering a motion to dismiss for lack of jurisdiction, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013).

RCFC 56 provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." An issue is genuine if it "may reasonably be resolved in favor of either party." *Anderson v. Liberty*

---

[6] The government initially filed its motion on December 29, 2022. [ECF 23]. It subsequently filed a consent motion to amend or correct its motion because "counsel inadvertently omitted the appendix of exhibits." [ECF 26] at 1. The Court granted the consent motion, [ECF 27], and the government filed its corrected motion on January 14, 2023, [ECF 28].

*Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material if it will make a difference in the result of a case under the governing law. *Id*. at 248. Facts that are irrelevant or unnecessary will not preclude summary judgment. *Id*. at 247-48.

The moving party bears the initial burden of demonstrating the absence of any genuine dispute of material fact; if the moving party satisfies the initial burden, it shifts to the non-moving party to show that a genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The court must draw all inferences from the underlying facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the court must not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *accord Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."). The court "must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law." *BES Design/Build, LLC v. United States*, 157 Fed. Cl. 241, 267 (2021) (citing *Anderson*, 477 U.S. at 250-52). If the record could not lead a rational trier of fact to find for the non-moving party, there is no need for the parties to undertake the time and expense of a trial because there is no genuine issue of material fact for trial, and the moving party should prevail without further proceedings. *Id*. at 268; *accord Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

**III.   DISCUSSION**

MIT asserts that it is entitled to damages for detrimental reliance and breach of contract due to the NPS's failure to maintain the docks on the Islands for MIT to operate its ferry service for the 2020 season. [ECF 1] ¶¶ 32, 38. The government moves to dismiss MIT's detrimental reliance claim, arguing that it is a claim for promissory estoppel that falls outside this Court's jurisdiction. [ECF 28] at 17-18. The government also moves for summary judgment on MIT's breach of contract claim, arguing that the Contract does not obligate the NPS to dredge the North Manitou Island dock and that the record high water levels of Lake Michigan excused the NPS from timely repairing the South Manitou Island dock. *Id.* at 19-24. In its cross-motion for summary judgment, MIT argues that it is entitled to summary judgment because, under the contract, the "NPS was obligated to dredge the area around the docks and physically repair the docks themselves." [ECF 29] at 6. For the reasons explained below, the Court finds that it lacks jurisdiction over MIT's detrimental reliance claim, and, therefore, it must be dismissed. The Court further finds that there is no dispute of material fact with respect to MIT's breach of contract claim and that the NPS breached its obligation under the Contract.

**A.   The Government's RCFC 12(b)(1) Motion to Dismiss**

MIT argues that it is entitled to damages for detrimental reliance because it "justifiably and reasonably relied upon . . . representations and assurances, the Contract, and the parties' long-standing course of conduct" that "the Area would be maintained, the docks fixed, and the passageways dredged in time for the 2020 season." [ECF 1] ¶¶ 34-35. MIT claims that it relied on the representations, assurances, obligations, and course of conduct when it "commenced taking reservations, hiring staff, purchasing inventory to offer and service passengers, conducting

6

repairs and maintenance to its facilities, and otherwise incurring great expenses." *Id.* ¶ 36. The government argues that MIT's detrimental reliance claim is "substantively, a claim for promissory estoppel[,]" which is outside this Court's jurisdiction. [ECF 28] at 17. In response, MIT asserts that "it is undisputed that NPS's representations were untrue, and MIT states a valid claim for detrimental reliance arising out of NPS's positive representations." [ECF 29] at 27.

This Court is a court of limited jurisdiction. *Brown v. United States*, 105 F.3d 621, 623 (Fed. Cir. 1997). This Court's jurisdiction is defined by the Tucker Act, which waives the sovereign immunity of the United States for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or *upon any express or implied contract with the United States*, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a) (emphasis added). However, the jurisdiction of this Court "extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Hercules, Inc. v. United States*, 516 U.S. 417, 423 (1996).

The Court lacks jurisdiction to consider MIT's detrimental reliance claim. This Court has previously held that a claim for detrimental reliance is a claim for promissory estoppel. *See Jackson v. United States*, 162 Fed. Cl. 282, 293 (2022); *Copar Pumice Co., Inc. v. United States*, 112 Fed. Cl. 515, 538 (2013) ("[C]laim based on detrimental reliance is a claim based on promissory estoppel."). In a promissory estoppel claim, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts (Restatement) § 90(1) (1981); *see XP Vehicles, Inc. v. United States*, 121 Fed. Cl. 770, 782-83 (2015). Nevertheless, "[t]his court has no jurisdiction over claims for promissory estoppel, as it requires the finding of a contract implied-in-law against the Government, for which there has been no waiver of sovereign immunity." *Sinclair v. United States*, 56 Fed. Cl. 270, 281 (2003); *Lion Raisins, Inc. v. United States,* 54 Fed. Cl. 427, 431 (2002) (quoting *Hercules, Inc.,* 516 U.S. at 423). In asserting its detrimental reliance claim, MIT relies on assurances (i.e., promises) made by the NPS officials during negotiations, rather than the express terms of the Contract, to recover damages for the actions that MIT took as a result of those assurances. This clearly constitutes a claim for promissory estoppel. Accordingly, MIT's detrimental reliance claim must be dismissed for lack of jurisdiction.

### B.  The Parties' Cross-Motions for Summary Judgment

MIT also alleges that the NPS breached the Contract by failing to maintain the docks on the Islands so that MIT could provide ferry service during the 2020 season. [ECF 1] ¶¶ 30-33. The government argues that there is "no contract provision requiring NPS to do more than it did to maintain the docks." [ECF 28] at 23. The government also argues that the NPS was excused from its contractual obligation regarding the South Manitou dock because the "NPS's inability to provide access to that island during the 2020 season was caused by unprecedented flooding over which NPS had no control." *Id.* at 21. Additionally, the government argues that the NPS's liability is limited by an exculpatory clause in the Contract that pertains to suspension or termination of the Contract. *See id.* at 23-24. MIT cross-moves for summary judgment, arguing that the NPS lacked a valid legal excuse for failing to perform its contractual obligation to ensure

MIT's access to the docks during the 2020 season. [ECF 29] at 14-25. The Court finds that the NPS breached its obligation under the Contract to maintain the docks and that MIT is entitled to summary judgment.

For a breach of contract claim, the plaintiff must show a valid contract between the parties, an obligation arising out of the contract, a breach of that obligation, and damages caused by the breach. *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Contract interpretation is usually a question of law "generally amenable to summary judgment." *Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002). When interpreting a contract, "the Court must start with the plain meaning of the [c]ontract's text." *Enron Fed. Sols., Inc. v. United States*, 80 Fed. Cl. 382, 393 (2008). The contract language "must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Metric Constructors, Inc. v. United States*, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting *Hol-Gar Mfg. Corp. v. United States*, 169 Cl. Ct. 384, 351 (1965)). "When the contract language is unambiguous on its face, our inquiry ends, and the plain language of the contract controls." *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002). Additionally, a contract should "be considered as whole and interpreted so as to harmonize and give reasonable meaning to all its parts." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). It is a longstanding principle of contract interpretation that "the interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1359 (Fed. Cir. 2005) (quoting *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983)).

The plain language of the Contract imposes an obligation on the NPS to maintain the docks on the Islands. Paragraph 6(B)(3)(e) of the Operating Plan states:

> [The NPS] is committed to the upkeep and maintenance of the docks on North and South Manitou Islands to ensure access by the Concessioner's vessels. However, any damage to the docks as a result of careless docking, or leaving the docks, or passing the docks at greater than no-wake speed is the responsibility of the Concessioner.

[ECF 28-1] at 37. The plain meaning of this clause is that the NPS will maintain the docks in a condition that ensures access by MIT's vessels. MIT needs only two conditions to access a dock with its ferries: a functioning dock and water deep enough to get the ferry to the dock. Thus, a reasonable interpretation of this clause imposes a contractual obligation on the NPS to dredge, maintain, and, if necessary, repair or replace the docks to allow MIT to operate its ferry service. The Court's interpretation is reinforced by the fact that the Contract prohibits MIT from constructing capital improvement on or around the docks. *See* [ECF 28-1] at 8 ("The Concessioner may not construct any Capital Improvements upon [NPS] lands."). This means that MIT was completely dependent on the NPS for dock maintenance to exercise its right granted under the Contract to operate its ferry service for the public. Accordingly, the Contract imposes an obligation on the NPS to dredge and repair the docks on the Islands in a manner that "ensure[s] access by [MIT's] vessels." *Id*. at 37.

The government argues that this clause creates no obligation because "'upkeep and maintenance of the docks' [does not] equate[] to the dredging or 'repair' obligations [MIT] posits." [ECF 28] at 20. This argument is contrary to the plain meaning of the Contract. According to Black's Law Dictionary "maintenance" is defined as "[t]he care and work put into property to keep it operating and productive; general repair and upkeep." Maintenance, *Black's Law Dictionary* (11th ed. 2019). Both dredging and repairing the docks are necessary for the docks to remain "operating and productive." Furthermore, the government's narrow reading of this clause ignores the portion of the Contract that states "to ensure access by Concessioner's vessels." This clause plainly means that the maintenance performed by the NPS must be done to a level that ensures MIT's ferries can access the docks. If the NPS was not obligated to dredge or repair the docks, this portion of the clause would be rendered meaningless. *See Westfed Holdings*, 407 F.3d at 1359.

The government argues that, even if the terms of the Contract impose a duty on the NPS to maintain and dredge the docks, the NPS satisfied its duty by restoring access to the dock on North Manitou Island by August 26, 2020. [ECF 28] at 22-23. Put differently, the government argues that there is no timetable in the Contract that requires the docks to be operable during the 2020 season. This reading, however, would render other portions of the Contract superfluous. MIT is required under the Contract to provide ferry service to the Islands from May 1 to early November. *See* [ECF 28-1] at 25. MIT cannot fulfill this obligation if it cannot access the docks on the Islands. If MIT was unable to perform its obligation because of the NPS's actions, it would frustrate the purpose of this provision and render the ferry service schedule meaningless. Accordingly, interpreted as a whole, the Contract obligates the NPS to maintain the docks on the Islands to ensure access by MIT's vessels for the duration of the schedule established in the Operating Plan. *See NVT Techs.*, 370 F.3d at 1159. The NPS breached its obligation when it failed to ensure that MIT's ferries could access either dock during the 2020 season schedule.

The government also argues that the NPS's failure to raise the dock on South Manitou Island should be excused because "unprecedented high-water levels" in Lake Michigan were an "act of God" that rendered performance of its obligation impossible. [ECF 28] at 21. The act of God defense has traditionally applied only to extreme weather events, like floods, hurricanes, tornadoes, or blizzards. *See Gleeson v. Va. Midland R. Co.*, 140 U.S. 435, 439 (1891) ("[e]xtraordinary floods, storms of unusual violence, sudden tempests, severe frosts, great droughts, lightnings, earthquakes, sudden deaths and illnesses, have been held to be 'acts of God[.]'"); *Tombigbee Constructors v. United States*, 190 Ct. Cl. 615, 627 (1970) (noting that "bad weather such as unusually heavy rainfall is ordinarily an act of God"). An act of God is a particularly unusual and unforeseeable event outside the control of the parties. *Phoenix Bridge Co. v. United States*, 38 Ct. Cl. 492, 509 (1903) (holding that plaintiff could not assert an act of God defense where "the event which caused the impossibility of performance might have been anticipated and guarded against in the contract"); *see also* Jill M. Fraley, *Re-examining Acts of God*, 27 Pace Env't L. Rev. 669, 673 (2010) (noting that "many courts emphasize the defendant's ability to anticipate the disastrous event").

Lake Michigan's rising water levels, which disconnected the South Manitou Island dock from its pillars in 2020, do not qualify as an act of God that excuses the NPS from its contractual

9

obligation. The NPS anticipated the record-high water levels and the need to repair the South Manitou Island dock. The summer of 2019 saw "record water" and the water level was just below the decking of the dock on South Manitou Island. *See* [ECF 29-1] at 42. The Superintendent of the Park testified that in the "fall of '19 with the anticipated high water we purchased lumber and supplies to raise the dock on South Manitou Island before the 2020 season." *Id.* Additionally, an internal NPS email, dated December 18, 2019, confirms that the NPS planned to "submit an emergency package to improve/replace the South Manitou Island dock this spring" and that the NPS "would like to raise [the dock] 19 [inches]." *Id.* at 122. These statements and communications demonstrate that the rising water levels were anticipated by the NPS and that they had plans in place to address them. Accordingly, the rising water levels do not constitute an act of God that excuses the NPS from its obligation to repair the South Manitou Island dock prior to the 2020 season. *See Phoenix Bridge Co.*, 38 Ct. Cl. at 509.[7]

The government also asserts that the NPS's liability is limited by an exculpatory clause in the Contract. [ECF 28] at 24. Section 8(b)(1) of the Contract contains the following exculpatory clause, which limits the NPS's liability in the event of contract suspension or termination:

> In the event of suspension or termination of this Contract for any reason or expiration of this Contract, no compensation of any nature will be due Concessioner, including, but not limited to, compensation for personal property, or for losses based on lost income, profit, or the necessity to make expenditures as a result of the termination.

[ECF 28-1] at 11. The government argues that this clause applies because MIT requested a suspension of the Contract on June 9, 2020, [ECF 28] at 24, and the NPS granted a temporary suspension of ferry services from June 26, 2020, to August 26, 2020, [ECF 28-1] at 91, 93.

The exculpatory clause in the Contract does not relieve the NPS of liability. Exculpatory clauses cannot insulate the government from liability for its own breach of contract. *Freedman v. United States*, 320 F.2d 359, 366-67 (Ct. Cl. 1963) ("[W]e have held that general provisions seeming to immunize the Government from paying damages due to its own breach or negligence should be construed, if possible, as not covering serious breaches . . . causing important loss to the contractor.") (citing *Ozark Dam Constructors v. United States*, 130 Ct. Cl. 354, 359-60 (1955)). "Under longstanding precedent, the United States Court of Appeals for the Federal Circuit and its predecessor declined to apply these types of limitation on liability clauses where the Government's own unreasonable conduct caused a delay or suspension." *Blue Lake Forest Prods. v. United States*, 86 Fed. Cl. 366, 378 (2009) (collecting cases). "[T]he overarching principle [of these cases] is essentially the same: the Government cannot limit its liability if it acted unreasonably, failed to cooperate with, or hindered its contracting partner in the performance of its contractual undertaking" *Id.*

---

[7] The government states that COVID-19 was a "natural condition[] that impacted MIT's ability to operate," [ECF 28] at 12, and that COVID-19 "impacted the [USACE's] ability to issue a contract for the dredging work," *id*. at 13. However, the government does not explicitly raise COVID-19 as a defense to its failure to perform the dredging and repair work on the docks.

10

Applying the exculpatory clause in this case would effectively insulate the government from liability for its own breach of contract. The initial breach prompted MIT to request a suspension. In its June 8, 2020, letter announcing to its customers that it would not operate for the season, MIT references the condition of the docks making them inaccessible to MIT's vessels. *See* [ECF 28-1] at 87. Similarly, in its letter to the NPS requesting release from its concession contract, MIT explains that it made the request "because [it had] no access to the docks [that] year." *Id.* at 89. It is clear that the suspension was the direct result of the NPS's failure to perform its contractual obligation. The Court will not allow the NPS to breach its contractual obligation, force MIT to shut down its operations, and then escape liability because it neglected to maintain the docks on the Islands. *See Blue Lake*, 86 Fed. Cl. at 378.

Lastly, the government argues that MIT's damages are limited because MIT declined to operate during the 2020 season, after the dredging of the North Manitou Island dock finished on August 26, 2020. *See* [ECF 28] at 23-24. The government also states that "MIT was thus able to access the dock at North Manitou in August 2020-one month after NPS lifted Covid restrictions impacting operations at North Manitou Island." *Id.* at 22. These are relevant considerations for the Court when it is assessing damages and might serve to limit any expectation damages to which MIT may be entitled. *See Griffin & Griffin*, 116 Fed. Cl. at 177 ("Generally, in case of a breach of contract, the injured party has a right to expectation damages.") (citing *San Carlos Irrigation*, 111 F.3d at 1562-63). However, the Court declines to make any rulings on damages at this stage.[8]

In sum, the Court finds that there is no dispute of material fact with respect to MIT's breach of contract claim. The Contract imposes an obligation on the NPS to maintain the docks on the Islands in a condition that ensures access by MIT's ferries for the duration of the seasonal operating schedule, and the NPS breached that obligation during the 2020 season. Accordingly, MIT is entitled to summary judgment on the government's liability for breach of the Contract.

### IV.    CONCLUSION

For the reasons stated above, the government's motion to dismiss MIT's detrimental reliance claim for lack of subject matter jurisdiction under RCFC 12(b)(1), [ECF 28], is **GRANTED**; the government's motion to dismiss MIT's breach of contract claim for failure to state a claim under RCFC 12(b)(6) or, alternatively, motion for summary judgment, [ECF 28], is **DENIED**; and MIT's motion for summary judgment on its breach of contract claim, [ECF 29], is **GRANTED**. Additionally, MIT's request for judicial notice, [ECF 30], is **GRANTED**.

---

[8] The government also states that "MIT's relief for unanticipated changes is limited to a potential adjustment of the franchise fee." [ECF 28] at 24 (citing [ECF 28-1] at 14). This clause, however, only states that either MIT or the NPS "may" request an adjustment of the franchise fee in the event of "unanticipated changes." *Id*. Nothing in this clause suggests a limitation on damages in the event the government breaches the Contract.

The parties **SHALL FILE** a joint status report **on or before November 9, 2023**, proposing further proceedings for (i) ascertaining damages and (ii) handling MIT's pending motion for leave to file a supplemental complaint, [ECF 39], in light of the Court's decision on MIT's breach of contract claim.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz<br>
THOMPSON M. DIETZ, Judge